Good morning. David Faustman, Fox Rothschild Firm, for the defendants in this matter. It is an honor to be before this distinguished panel this morning arguing this case. Please, the court, there are three issues before you this morning on two appeals. One issue involves Rule 50, judgments as a matter of law, where there is a de novo standard. I don't think that's controversial. We have a directed verdict, to use the old parlance, in an inducement to breach claim under state law. Then we have a JNOV, again in the old parlance, on a statutory trade secrets case. Finally, there is the attorney's fees issue, which is an appeal from the other side, which is a question of abuse of discretion as the standard. And I won't say a lot about that. I'd like to go back to the first two issues, other than to say the judge's discretion, the district court judge's discretion, that there was no objective speciousness or subjective bad faith applying the correct standard of law is a correct one. This is a case where the attorney said that the evidence was a coin toss, a close case. It could go either way. Those comments, I think, inform us about the discretion not to award attorney's fees, and I think they also inform us on the Rule 50 decisions, because cases that are close calls, coin flips, that could go either way, to me, it seems, after 40 years of doing this, are the kinds of cases that are supposed to go to and stay with the jury. Now, on the inducement to breach claim, the plaintiffs, my clients, introduced a mound of evidence that there was inducement. Ed Kaplan, who is the CEO of Defendant Oceanair, induced Paul Pelaire to breach the non-compete agreement. Well, I guess that's the real test there. I went through the record to find out what Oceanair did to induce, and the only place I could get to anything was, your brief suggests that Oceanair offered 70% of the profit to the husband to form the competing enterprise, but when I looked at the record, it said, I mean, the record says the husband made the offer. Oceanair just said, no problem. All evidence seemed to say the husband was trying to convince everybody else to do the same thing, and went to Oceanair. I don't know what evidence you have that Oceanair was doing the inducement. Well, there was a negotiation in September of 2011 between Mr. Kaplan. Well, if Kaplan contacts Oceanair and says, I'd like to do this, and this is what I want to get into, hard to seem like Oceanair induces anybody if they just say, okay. Well, it's a matter of some debate as to who said what to whom. Well, but the honest truth is, I looked all over in the record to see what you allege Oceanair said to induce, or did to induce, and I can't find anything. Well, they did agree to the to the profit split. Okay, so you're saying that the district court should have said on a directed verdict, and I'll use your words, that just agreeing to what the husband had suggested was enough, is enough to induce? I think that becomes a jury question. Just because they agree? Well, because they agreed, and the circumstances... I mean, if I looked at inducement, and looked at the evidence that you must produce on inducement, I don't think the agreement would meet the elements. The record does reflect that it was Mr. Kaplan who suggested that there be this arrangement for international distribution and a joint venture to do it. No, well, I don't know. It seemed to me that it was, in fact, the husband of the one you want to sue who made the offer. Made the initial contact. And made the offer with an email on 9-28 of 2011. Subsequently, made that offer after they discussed it. One, the jury could have presumed, and I think they would have. Well, nobody said anybody else made the offer. The best I can find is, okay, no problem. There was a discussion about a joint venture, and it was accepted. So that's the best evidence you have on the inducement? Yes. And the inferences that follow. Let's just then change to the judgment notwithstanding the verdict, if you will, to use your terms. If I look at the judgment notwithstanding the verdict, and I'm looking at what evidence there is there, and this, I think, is the important part, because the district court let this go to the jury. Indeed. And so, what is the alleged trade secret? The trade secret are customer lists. Is it the Christmas card list? That is one of the two lists. Is it a work email address book? That is the other list known as the cell phone numbers. I understand. In her cell phone, there were things. Is that it? Combined with the circumstances of those lists, the fact that they were not generally known to the public. Well, now, just a minute. I got to find out where the lists are. My worry is that you're trying to make a trade secret out of her knowledge. Her knowledge? I mean, her own knowledge herself cannot be a trade secret. I agree with that. So, we're only talking about what lists, I mean, if it's in a cell phone, nobody asked for that back. I guess I'm trying to figure out what that is. So, if you say it's a Christmas card and the work email, what's the economic value of the Christmas card list? The value, and the jury found economic value. I know what the jury found, but what is the value? That these are not just potential customers, but actual customers of the prior employer with whom the employee, who we use the word steals, I'll say takes, misappropriates. You can use steals, but I'm trying to find out if Brenda, if Breda, had not used this list herself, was there any value? In the hands of another employee without relationships and specific, specialized knowledge of these customers, it may not have had value, which is why they were... The worry that I have is, it seems to me, the district court focused, after the trial, on what is the list. And they said, it's a Christmas card list, it's an email address book, and it isn't what Brenda knows herself. And, therefore, I don't think it really is a trade secret. And your argument always was that what Brenda thinks, or what Brenda knows, makes it a trade secret, and I can find no law to suggest that's true. That is not our argument. I think that's a bit of a straw man that has been created here. We're looking at the More Life case, which is the controlling law, I think it's fair to say, in California on this, which says that a customer list can, in and of itself, be a trade secret. There's Ninth Circuit law on that. You all have an opinion. Well, but if I look at California law, it's got to be more than just a list of names and addresses. Well, in More Life, it suggests that it does have to have value under the circumstances. Independent economic value. Right. But it's more than just the names and addresses. I mean, the bottom line is, the actual potential information there, looking at More Life, looking at California Civil Code 3426-1, is that there's got to be something more than just names and addresses. Well, in the More Life case, there was something more, and it was the... But we're not talking about More Life here. We're talking about this case. The same... What extra do we have here? You have relationships, just as in More Life. Well, the relationships are created by the list itself, right? I mean, the fact of the list is a fact of an existing relationship. But there isn't anything more described on that Christmas list than names and addresses. There's no customer specifications, for example, customer preferences. Nor was there in More Life. The list, the so-called list in More Life, was a shoebox full of business cards. The extra factor here that is in More Life, and as in this case, independent of the list, is a personal relationship with that list, which was a company list, and the history of specialized doing business with the people on this list. If the list had value, why do you allege that it was worthless after Bretta left the company? Well, I suppose it's the proverbial cat out of the bag. She used it, and there was unjust enrichment, and the unjust enrichment... But if it's worthless after she leaves, then the secret has more to do with her and her knowledge than it has to do with the list. Well, I'm not sure we ever said anywhere that it was worthless. We did not try to... The preliminary injunction was denied on a technicality of standing as to who owned the trade secrets. That was subsequently remedied, but I don't believe we ever said it was worthless. It still has value. She's still using it. I'll look very carefully at what you alleged. What information on this list is not publicly available? There was no evidence that any of the information on the list was publicly available. There was an allegation that one could figure out the names on this list, and that was specifically... So it can be learned otherwise without great expense. No, the jury question... No, no, just a minute. Can it be learned otherwise without great expense? No. No, because it is... What about when Mormon testified that rental houses are well-known within the industry and all you've got to do is contract? Well, he testified that potential customers can be found in public information. This was not a list of potential customers. These were the actual customers, prior customers of the business, of my clients. That is not a list, a compilation that is generally known. Jury question number four, specifically on the affirmative defense, is this readily ascertainable? Can it be reconstructed? The evidence was put in on that point. Not one customer from the list was identified or found in any of the public sources put in the records. We have that in detail. And the jury specifically found that the defendants did not prove it. It is an affirmative defense. The judge respectfully flipped the burden of proof and put the burden on my clients to prove that it was not readily publicly ascertainable. And that was error. I understand your argument. Well, say you had a truck driver who, in the course of his or her work, became, got knowledge of these different businesses that were using his client's services to transport their equipment and scenes and all the rest of it, people who were in the movie business. And then he just quits working there and decides that he can do the job for them as a freight forwarder for less money. What is there that would block him, this truck driver, from going ahead and starting his own business? If he took the company customer list. No, he knows who the customers are because he delivers to them. That's a different case and it's not this case. And I agree with you that there would not be a cause of action against that fellow who had everything in his hands. But just a minute, that's exactly this case. So was she acting in a fiduciary relationship with your client? She took the list. It was proprietary information that was protected. It was password protected.  And she used it. But she had some parts of the list on her cell phone. She was working from home. She had access to this customer information from home. You knew she was working from home. She had it on her cell phone, her personal email. And all we've got are names and addresses on a list, which I guess was protected because it was password protected. But nonetheless, she had all this stuff or a lot of it. I don't know how much because I tried to glean from the record how much she had on her own email. And you never asked for it back on her old cell phone. Well, the record isn't clear exactly what was on the cell phone. We never obtained that. I know that. The email was company email. It was what she was using. She was using the company information. And that was a list that should not have been taken. Did you ever tell her not to use the cell phone, not to put the information on her cell phone? There's nothing in the record that says anything about the cell phone. Did you ever tell her that information was confidential? Certainly. Where? There are policies in the record. What policy? There are company policies. I know. Tell me when you absolutely dealt with her. You've dealt with her husband. I've got one of those situations. But with her, what did she sign? The non-compete agreement. Because I couldn't find it in the record. It's curiously not in the record. So there is nothing in the record about that. Well, there were policies of which she was aware. There's nothing that she signed. That is true. But the policies were there, and the jury found that it was protected. Well, I guess the jury found that. I want to talk to your opponent about that. But the worry that I have is that, yes, trade secret is a question of fact. However, if there are no facts which would suggest it's a trade secret, or if there are no confusing facts or no facts that disagree with one another, then on summary judgment one can find as a question of law. And that's what the district court finally did, saying I've given you every benefit of the fact you've proven, and there's nothing that's confusing or even a fact with which you disagree, and I've determined it's a judgment notwithstanding the verdict because there's no evidence. The judge had to reverse incorrectly and erroneously the burden of proof in order to get there. On the affirmative defense of whether the list, the information, was readily ascertainable, the jury had found that it wasn't generally known and that it was secret, that it had value, and that it had been misappropriated and used. The only way that the judge could reverse that was to get the burden of proof wrong on jury question number four. Counsel, on the inducement question, did you bring suit against Mr. Polera? No. No, and there were contractual reasons for that. There was an arbitration against him pursuant to an appointment agreement in New Jersey, and the damages received in that case were not duplicative of the damages sought in this case here against Ocean Air for inducing his breach. If there are no further questions, we've taken you well over your time. I will allow a minute for rebuttal. Thank you so much for your kind attention. Okay. Good morning, Your Honors. May it please the Court, I'm Steve Burton. I represent the counter-defendant and appellant acquitted of Polera Santini and Santini Productions. We had agreed with my counsel for Ocean Air beforehand that I would take about five minutes and defer to Ocean Air because they have many more issues that they have to address to the Court, so I'll try to be brief with that so my co-defendant has sufficient time. I want to first start by rebutting some of the things that Mr. Faustman just told the Court. This issue of coin toss, this discussion of coin toss, Mr. Faustman is good at this. He was good at trial at this. But it's a twisting of the facts. That coin toss discussion took place, my recollection, and I could be wrong, it took place after the motions for summary judgment were all heard. The Court may recall from reviewing the record that all parties made summary judgment motions and they were all denied. And at some point the Court made that distinction or comment or clarification. Now, we all know that we had a trial and a lot more information came in, especially during our case in chief regarding the issue of the trade secret and the factual basis for finding that there was no trade secret. I think the Court clearly has the 50A motions came after their side had presented the evidence. That's correct, Your Honor, and the coin toss discussion may have taken place then too. Again, I'm a little hazy on that, but this did not take place at the end of the defendant's case in chief. So at that point, we have only one side having the evidence in, and the district judge says to himself, I'm not going to make that determination. But he waits for the evidence to see if there is any thereafter. That's correct. Did you ever ask for a motion, a renewal of your 50A motion after the evidence was in? Well, yes, that was the Rule 50B motion. Rule 50B. No, but the 50B motion came after the jury verdict, didn't it? Yes, Your Honor, and as far as I know, we're allowed at the close of evidence to renew. Actually, that motion is a renewal of the 50A motion. I understand. That's the first time then you removed the motion was after the verdict. That's correct. So you didn't make any motion after the evidence was in. It was only after the verdict was in. That's the way I saw it. Right. The Oceanair and Ms. Pallara or Santini made 50A motions upon the close of Plaintiff's case in chief. And then after all the evidence was in and the verdict was in, then we renewed the 50A motion per Rule 50B. So anyway. Well, it seemed to me that the district court was really saying at the time of summary judgment, and I don't think that's a big deal because at the time of summary judgment, he's giving every evidence to the other side, and he said there'd be no summary judgment. So I don't think that really weighs very heavy. When he gets to the 50A motion, he's again suggesting that the way it comes in and the testimony given has significance and that the case he's looking at really makes that evidence quite important, and so he's going to send it to the jury. My worry is that the way you fashioned the jury instructions, the way it seems that you, the judge, put the jury instructions to the jury, knowing that trade secret is ultimately an issue of fact, that he explains all the law to them. He lets them then determine the significance of testimony, as he'd suggested after the 50A motion, and it seems a little bit, it seems like he, when you'd look at the standard of review for a 50B motion, he's forgot the standard of review. He's now making those determinations on his own rather than deep down suggesting, is there any evidence to sustain it? I understand your point. I believe that Judge Feese essentially came to the conclusion, especially after listening to witnesses, Ryan Moorman, who works for Radiant Logistics and DBA, and Robert Daniel, who is a customer of Santini Productions now and was formerly a customer of DBA. I think that he was impressed by their testimony regarding the fact that my client had a stellar reputation in this industry. There was no information in those customer lists that had independent economic value because there was nothing in those customer lists that provided her with a substantial competitive advantage. The substantial competitive advantage in this case… Are we talking about economic value? Well, the second rung of the element for a trade secret is it have independent value, economic value. In the case of Holden, I believe it's Morelife, that in order to have independent economic value, that information has got to be more than just information. It's got to provide a substantial economic advantage. Well, the problem comes, and I know where you're going, but the problem comes… He's already had a 50-A motion, and he said, much of this is going to depend on the witness's testimony and what they say. And then he fashions jury instructions very carefully to mimic what the California law suggests it has to be. And then he says, you know, we'll let the jury decide because everybody's testimony is going to make a difference. And the jury then says, yeah, there's value. Yeah, there's reasonable efforts to keep it secret. And yeah, it wasn't readily available based on the testimony of the witnesses. It seems then at that point he is reweighing evidence he's previously said the jury has to weigh. And that's the worry that I have here in that if that's what he's doing, that's not a motion for judgment notwithstanding the verdict. Well, I can only quote from the judge's order. I looked at his orders. I was even going to ask you questions about what he said in 50-A, but you've captured it. My worry is this. This seems to be, if he's really going to say this depends on testimony and whosever testimony you believe, then at that point the jury must have believed your opposition's witnesses and not yours. That's probably true, and I don't understand why, given the nature and the uncontradicted character of the evidence, because both Santini, or I shouldn't say both, but all of Santini and Mormon and Daniel all pretty much testified to the same thing, that her reputation in this industry, she's number one, that the information is publicly available, that any of us in this room could go on a computer right now and find out every film production in the state of Idaho if they wanted to. I understand. Not Idaho, because we don't have any. It would be easy to find that one. But I'm just saying you can go on to Georgia. You can go on to California. There are websites for Los Angeles. There are websites for Southern California. It's endless. But he would just represent, and I read his briefs, he would say, but when we asked you what you looked at or what independent sources there were, you didn't have any. You couldn't give any. You couldn't look at any independent. The only thing you could look at is the list for sending out this gigantic email to all these people. You didn't look on the Internet to get it. You didn't look at anything else. All you did is look at the list, the Christmas list that you got. That's what his argument is. That's what his argument is, and he's dead bang wrong, and I'm going to tell you why. First of all, let me make two points to the Court. Judge Fee said at page 20 of his order that the trial record is devoid of either direct or circumstantial evidence that DBA possessed any information about customers that could not be obtained through readily available sources, and the information is, therefore, not entitled to protection. Let me couple that with something else that came up at the time of trial, and I brought this up in our Rule 50B motion, which is quite important. You know, we live in an age where Mr. Burton, I want you to address Judge Smith's question. I know we've taken you well over time, but you now consume 10 minutes. Well, I'm sorry. Let me just finish with this to answer the question. When he said devoid of evidence, I don't think he was weighing the evidence, number one. Number two, the reality is that on the morning, the day that Ms. Pallara sent out emails to customers, she had a call earlier in the morning at 942 Pacific Standard Time with a fellow named James Bednark, who is an art department coordinator with a well-known TV series. I think it's New York SUV or SUV New York. I don't follow it. He had no idea that she had left the company, but she explained that she had left the company. She's on her own now. That was a call that was unsolicited. It came directly to her. That's uncontradicted. Mr. Bednark immediately went on a Google group called Coordinators 911 and put out the information on the Internet about 10 minutes later that Ms. Santini was in her own business now and made a point of mentioning in that group that contains thousands of people that she's the best point-to-point in the business, which means essentially she's the best freight forwarder in the business from getting materials from Los Angeles, let's say, to Idaho or Wyoming or whatever to a remote location if it's lighting equipment or cameras or whatever. And that was Exhibit 122 where Mr. Bednark – that was trial Exhibit 122. And the reality is is that according to the record, the first time she replies in a kind of a coarse manner, about 30 minutes later some employees of hers that the response has been robust. She was referring to some coarse metaphor. But the bottom line is she did not – the record in this case, she did not send out an e-mail until about five hours later. It was already on the Internet. People were already calling her. It was out in the industry. It was there because a third party who had nothing to do with this at all and doesn't have anything to do with trade secrets announced this in his coordinators group, and kaboom, everybody started calling her and writing her e-mails and congratulating her on her new business. And that's it. Then she sent the e-mails out personally. You know, I wasn't there at the time. But I don't think that Ms. Pallara had to send out one single e-mail to anybody. I think she's that good and she's that well-known in the business. And as Judge Fies pointed out in his order, and I'm paraphrasing, that train would have left the station anyway given who she is and how well-known she is in the industry. And that information that was in the customer list provided no substantial competitive advantage whatsoever. According to the facts of this case and according to what I just told you in terms of the word getting out to the industry. Thank you. Thank you, Mr. Burton. Sorry to have taken you too long. Good morning, Your Honors. May it please the Court, my name is Catherine Savoy and I represent Oceaneer. From the very beginning of the operation of Ms. Santini's business from the very first day, Radian and DBA demonstrated that their true motive in this case is not a concern over a trade secret, but their true motive was to prevent Ms. Pallara from utilizing her reputation and her relationships that she had developed over 20 years in her career in another capacity, which is directly contrary to California law and public policy, promoting employee mobility and supporting competition of employees. How do you distinguish this case from Moore Life? I mean, Moore Life just seems to me that there's a descent in Moore Life, and it just seems to me it's a fairly troubling opinion that we would have a shoebox full of business cards that could be classified as a trade secret. Well, I think in Moore Life there was evidence of additional information. Well, first of all, the market in Moore Life was different than the market that we face here. In Moore Life it was the situation of the roofers. Everybody's got a roof. There's a subcategory of commercial roof owners who need regular maintenance and don't want to do a replacement roof, and the regular maintenance is obviously a helpful thing to them because they don't have to replace their roofs as frequently. Kind of like the route cases in Moore Life, the company knew who these people were, and the Moore Life had a lot of evidence on the investment that the company put into through telemarketing, through sales calls, through a number of different methods that the company had expended money and resources to identify who these people were. So the identity of the people was a subsection of a much greater category of people. And in that list there was a proprietary interest because the company who owned the list had invested such substantial resources in the development of the list and the knowledge of the list. That is entirely different than the case that we have here. In this case the evidence was very clear that the potential customers of Radiant DBA Santini in the entertainment niche of the freight forwarding business was a relatively limited and set group of individuals. That these individuals were available, their identities were available through public resources, through Internet resources. The judge named them in their list and we've named them in our brief, and so has Mr. Burton. Anyone, anywhere, at any time could have identified these individuals. It's a very small market. It's also a market that is approached daily by various vendors. And the vendors are competing in an open market for this business, much as the case of the Continental Car case, Mosley. In that case it was a smaller market. There was competition daily for the customers within the market. And the customers chose the vendor that was able to offer the best price and the best grade on any given day. And that's really what we face here with the freight forwarding business. There are many competitors in this business, and there's many people that contact the production managers and ask them to please give me a quote on a daily basis for getting freight from point A to point B. And let me know when you can get it there and how much it's going to cost and call me back and give me that information. Then the customer will call Bretta Santini and ask her for that same quote. She will give back that quote. It might even be the same quote, but the customer will go with Bretta Santini. Why? Because she is 24 hours available to them. She has a reputation in the industry of always getting the materials from point A to point B or of communicating with them if it can't be done. That's a reputation that is not something, as Judge Feist said, that either DBA or Radiant can claim to own. This is really a case about a reputation in a small, select, in an industry that has a small, select, excuse me, has a small, select, easily known and easily identifiable base of customers. Does that answer your question, Your Honor? I would like to, however, state that I would like to address, first of all, the question that Your Honor raised about the Rule 50A and the Rule 50B. My understanding, and I think the rule is quite clear, that the judge does have the ability to submit the case to the jury and reserve for a later determination the legal issues. If the evidence, as a matter of law, does not amount to a trade secret, then because there is no evidence of a trade secret, the judge is not required to decide that before he gives the case to the jury. He may still give the case to the jury for good reasons, but if the jury commits an error, a serious error, and the judge looks over the testimony and the evidence and sees that, in fact, under the law there is no evidence of a trade secret, the judge is then free to take that decision back and is free to grant the Rule 50B motion. Otherwise, why do we have these rules? Well, again, if they meet the standard of review. That's why I was talking to you about the standard of review. I now hear your argument, but he can do it if he meets the standard to do it. And the standard is no evidence to sustain the verdict. And in this particular case, he talked a lot about the evidence and how the evidence was going to be performed. And that's why I asked the question I did is because his whole repertoire is this evidence can only be about who believes who in this particular case. One's going to say one thing, one another. And in this case, I'm not going to make that determination. I'm letting the jury make it. And then afterwards he says there is no evidence. That's why I asked the question. I do respect the question, but I do respectfully also disagree with that analysis of what happened. I do think that there was no evidence. Looking back over the entire trial transcript, there was no evidence of a trade secret. The definition of a trade secret, as Mr. Burton said, must demonstrate independent economic value. And the courts have said that independent economic value means that by virtue of the secrecy of the information, it provides a competitor or the person who owns the information with a substantial business advantage. There was no evidence of a substantial business advantage in knowing who these people were. In fact, the evidence was just the opposite. Ryan Moorman, a person at DBA Radiant who took over Bretta Santini's responsibilities after she left, had many years of experience in the industry. And he had the contact information. He testified that he was not able to make a sale based upon that contact information. Why? Because he could not breach the relationship that Bretta Santini had with the customers. It was her reputation that resulted in the customers giving the business to Bretta Santini. And he tried and said that he was unable to do it. Well, maybe the judge believed that the jury had been sitting there and had listened to all the evidence and he thought that, well, give them a chance and see what they come up with. Maybe his thought was they come up with the same result that I would come up with. And once the jury comes in with a verdict, that's the end of it. Who knows? I believe that that is what the rule is intended to accomplish or to provide an opportunity for the judge to do and that that is what happened in this case. But before I end, I would like to address the inducement claim just very briefly. Your Honor, our position is that there was no inducement because the contract was breached before Mr. Pallaro ever contacted Mr. Kaplan. So anything that Mr. Kaplan said or didn't say from that conversation onward is irrelevant. The contract that I'm talking about is the non-compete that Paul Pallaro signed when there was an act... It's quoted on page 8 of my brief in the acquisition by a radiant of DBA. He signed an agreement that says very clearly he would not directly or indirectly engage in any activity or act in any manner, including as a consultant or advisor... But, Counselor, your argument is then because it was breached before, it can't be breached again. Their argument is it was breached. It may have been breached 40 times previously, but it was breached this time with your client. I think that that argument... I mean, there is no... I look for California law that once breached a contract, contract is always breached. I look for California law that suggests you can't breach a contract 4 or 5 times. You can, and it was breached in your... What they're suggesting is you helped breach or induced the breach this time, regardless of how many breaches there were. I would say that my answer to that is that there is a causation requirement in this case. And that's what I question you about. If that's your argument, I think we know your argument. Okay, thank you. Then I will move on to my final argument, which is the attorney's fees. Counsel, you don't really want to press the attorney's fees now, do you? Well, if my time is up, I won't, but I would like to... I think we understand. We have the briefing. I think we understand the attorney's fees. Okay, I would like to refer you to my brief on that. Okay, thank you. Thank you. Let me finish, you know. Let me finish this. Yes, go ahead. A few brief points. I do think the trial judge abandoned the standard of review here and engaged in some speculative fact-finding and took away from the jury the province of the jury that he had given them, which was to weigh the evidence, the causation, the elements of the claim, the affirmative defenses, and the case should have stayed with the jury. Now, Mr. Burton and Ms. Savoy both said that, quoting from the trial judge, that the record was devoid of evidence that this list was not readily ascertainable. Also, anyone could have recreated this list or identified this list. And the judge said, therefore, it was DBA's failure. That's a flip of the burden of proof, and an erroneous one, notwithstanding everything else about the burden of proof and the standard of review. The burden was placed on the defendants to prove the negative that there was, that this was not readily ascertainable, when that was an affirmative defense  and found in defendants' favor. There's this notion, we heard it here, that the jury committed serious error. What was their error? They did exactly what the trial judge told them to do. As you stated, Judge Smith, the jury instructions were meticulous, the jury form was meticulous, and hewed very closely, identically, to the Cassie instructions.  The judge just disagreed with the jury's finding of fact and particularly on causation, substituted his own version, his own speculation, improperly so, under Rule 50, we believe. Thank you very much. Okay, thank you. Thank counsel for the argument. That concludes the oral argument calendar for today. The court stands in recess. All rise.
judges: Pregerson, Bybee, N.R. Smith